# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA, EX REL. ANDREA SCHULTZ**, | **CIVIL ACTION** |
| Plaintiffs, | **Case No.  2:17-cv-237** |
| v. | **Judge: John E. Steele** |
| **NAPLES HEART RHYTHM SPECIALISTS, P.A.**, a Florida professional association, **DR. KENNETH PLUNKITT**, an individual, | **Mag. Judge:  Mac R. McCoy** |
| Defendants. | |

## AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE QUI TAM PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

**NOW COMES** the Relator, **ANDREA SCHULTZ** ("Schultz" or "Relator"), by and through undersigned counsel, on behalf of the United States of America ("United States") and brings this action against Naples Heart Rhythm Specialists, P.A. ("NHRS") and Dr. Kenneth Plunkitt ("Plunkitt")(collectively "Defendants"), under the False Claims Act, 21 U.S.C. §3729 et. seq. ("FCA"), and in support of the Amended Complaint, Relator alleges as follows:

## INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States against the Defendants for submitting and causing to be submitted false claims to the United States under the government healthcare program, Medicare and Medicaid ("Program"), from the past six (6) years through present ("Relevant Period").

2.      During the Relevant Period, Defendants have fraudulently and systematically submitted and/or caused to be submitted false claims to receive monies from the Program knowing of the falsity of such claim and the false and fraudulent misrepresentations contained therein.

3.      During the Relevant Period, Defendants has received monies from the Program as a direct and proximate result of its fraudulent claims submitted to the Program and the false and fraudulent misrepresentations contained therein.

4.      Defendants perpetrated this scheme in order to obtain monies from the Program for business and personal profit.

## JURISDICTION AND VENUE

5.      These claims arise under the Qui Tam provisions of the FCA. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

6.      Personal jurisdiction and venue for this action are predicated on 31 U.S.C. §3732(a) which provides: "any action brought under §3720 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by §3729 occurred." All Defendants conduct their business in, among other places, Collier County, Florida, which is within the Middle District of Florida, Ft. Myers Division. Defendant **PLUNKITT** is domiciled within Collier County, Florida and conducts business within Lee County, Florida.

7.      Under §3720(b)(2) of the FCA, the initiating Complaint was filed *In Camera* and under seal for a period of at least sixty (60) days, and was not served on the Defendants until this matter was unsealed.

2

## PARTIES

8.      Relator Schultz is a resident of Collier County, Florida. She is an employee of HMA and works at Physicians Regional Medical Center (PRMC) as a registered nurse (RN) in the cardiac catheterization lab. She began her employment there in 2014 and has regularly worked alongside **PLUNKITT**.

9.      Defendant **NHRS** is a Florida professional association that was created in 2007 and is owned and operated by Defendant **PLUNKITT**. Defendant **NHRS** specializes in treating cardiovascular disease and clinical cardiac electrophysiology and provides cardiac services to **PRMC**.

10.      Defendant, **DR. KENNETH PLUNKITT** is the President or "managing physician" of Defendant **NHRC** and is a resident of Collier County, Florida. **PLUNKITT** and **NHRS** provide cardiac services at PRMC in Naples, Florida. **PLUNKITT** became a physician in 1994 after graduating from the University of South Florida. He did his residency in internal medicine at the University of South Florida from 1994-1997 and did another residency at the University of South Florida in cardiovascular disease from 1997-1999. He completed his fellowship in clinical cardiac electrophysiology at Jefferson University from 1999-2001. He is Board Certified in internal medicine- cardiovascular disease and internal medicine- clinical cardiac electrophysiology. **PLUNKITT** founded **NHRS** in 2007. In July 2018, he co-authored a research paper that concluded, in part, that leadless cardiac pacemakers experienced fewer overall short- and mid-term complications, including infectious and lead- and pocket-related events. And in that same paper, he and his co-authors affirmed that "trans-venous lead extractions carry significant risk in the event of vascular or cardiac tears."

3

11.     During the Relevant Period, Defendants, acting with, through and under the supervision of its highest executives and managers, fraudulently submitted and/or caused to be submitted claims to receive monies from the Program knowing of the falsity of such claims and the false and fraudulent misrepresentations contained therein.

12.     During the Relevant Period, Defendants, acting with, through and under the supervision of its highest executives and managers, received monies from the Program by fraudulent means and perpetrated schemes in order to, and did, obtain monies from the Program, distributing the same to Defendants' physicians and to the Defendants as a company despite the fact that such monies were fraudulently obtained.

13.     The policies and procedures carried out by the Defendants in perpetrating these schemes were established and/or ratified at the highest corporate levels of Defendant **NHRS**, including **PLUNKITT**.

14.     As a result of her employment with Defendant Physicians Regional Medical Center (PRMC) as a cardiac registered nurse, Relator has first-hand knowledge and information regarding the business operations and fraudulent claims for Program monies paid by the Government Program on account of the Defendants' fraudulent schemes.

15.     Relator brings this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relator is an original source for the facts alleged in this Complaint. As a result of her employment with PRMC, Relator has first-hand knowledge of the business operations of the Defendants and their intentional and/or reckless disregard and fraudulent conduct in connection with their knowledge, supervision and direction of the illegal and fraudulent practices carried out by the Defendants.

4

16.     The Relator repeatedly confronted supervisors and executives with PRMC with her concerns about the fraudulent claims for Program monies and the fraudulent retention of monies fraudulently obtained by the Defendants.

### STATUTORY & REGULATORY BACKGROUND

**A.  The False Claims Act**

17.     The FCA imposes liability upon any person who (a) "knowingly presents or causes to be presented [to the Government] a false or fraudulent claim for payment or approval" or (b) "knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §3729(a)(1)(A) and (B), as amended.

18.     The FCA imposes liability not only for the intentionally false or fraudulent conduct, but also where the conduct is merely "in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A)(iii).

19.     The FCA broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property… that… is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, if the United States Government- (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse any portion of the money or property requested or demanded." 31 U.S.C. §3729(b)(2)(A).

20.     The Florida False Claims Act (FFCA) has a nearly identical definition of claim, only substituting Florida or any agency thereof for the United States. F.S. §68.082(1)(b).

**B. Government Health Care Programs.**

21.     Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

22.     The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide healthcare to low income individuals. 42 U.S.C. §§1396-1396v. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through the Center for Medicare and Medicaid Services ("CMS"). States pay doctors, hospitals, pharmacies and other providers and suppliers of medical items and services according to established rates. See 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended… as medical assistance under the State plan…" See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

**<u>DEFENDANTS' FRAUDULENT SCHEMES & SUBMISSION OF FALSE CLAIMS</u>**

23.     Relator Schultz is a RN at PRMC and was assigned to work directly with **PLUNKETT** in PRMC's catheterization lab.

24.     From the commencement of Relator Schultz's employment with PRMC, she gained knowledge of and witnessed the Defendants' submission of false claims to Medicare and Medicaid.

**A.      Defendants' Submission of Claims to the Program for the Unnecessary and Dangerous Lead Extractions.**

25.      From the commencement of **SCHULTZ**'s employment with PRMC, she gained knowledge of and witnessed the Defendants' submission of false claims to Medicare and Medicaid for the unnecessary and dangerous lead extractions and pocket revisions performed by **PLUNKITT** for pecuniary gain and not medical necessity whatsoever.

26.      The vast majority of patients at PRMC that are treated by **PLUNKITT** are Medicare recipients.

27.      Pacemakers and implantable cardioverter-defibrillators (ICDs) deliver energy to the heart through thin, flexible wires called leads.

28.      A lead is a special wire that delivers energy from a pacemaker or ICDs to the heart muscle.

29.      A lead extraction is not medically proper unless there is an infection and should only be performed within thirty (30) days of initial implantation.

30.      Superfluous non-functional leads can on the whole be more safely abandoned than extracted.

31.      In the vast majority of cases where a lead ceases to function properly, the medically proper procedure is to "cap" the lead and simply implant a new one. This procedure is relatively simple and is of low risk to the patient.

32.      A lead extraction, however, is dangerous as it is the removal of one or more leads from inside the heart. Leads that are placed outside the heart during open-heart surgery cannot be removed during this procedure. Pacemaker and ICD leads that have been in place for many years can become very attached to the heart and blood vessel walls, making them difficult to remove.

33.     Scar tissue envelops chronically implanted leads at discrete sites anywhere along the course through the veins or myocardium, and it behaves as if shrink-wrapped around the leads. Therefore, when trying to pull a lead out, any bulge in the lead has to be dragged through that scar. The electrodes make up for most of the protruding parts, especially the flanges of passive fixation leads. Further, indentations in the lead can be filled with fibrous tissue and resist extraction. The ingrowing of this scar in the defibrillation coils is a major problem when extracting ICD leads. Even when leads dislocate from the myocardium, this often leaves a rim of fibrous tissue around the tip, complicating the extraction even more.

34.     Sometimes, the path of least resistance is the vessel wall rather than the scar. Disruption of the superior caval or brachiocephalic vein is the most devastating complication of lead extraction, as it results in swift exsanguination in the thoracic cavity and is very difficult for the surgeon to control or repair. Extracting these leads can cause significant damage to the heart, causing life threatening conditions such as cardiac tamponade and ultimately death.

35.     If a lead extraction is necessary, prudent medical practice is to have a cardiac electrophysiologist and a cardiothoracic surgeon present. This approach is estimated to save a life every 100 or 200 procedures.

36.     However, rarely is it truly medically necessary to perform a lead extraction unless the lead has caused an infection. The infection rate is just 1-3%. The Chief Medical Consultant for the California Correctional Health Care Services Office of Legal Affairs, Dr. Bennett Feinberg, has said as much, swearing under oath that the extraction of defibrillator leads is not routinely performed in the absence of an infection, particularly when, as here, the leads have been in place for an extended period. Dr. Feinberg also states under oath that unnecessary extraction would put a patient at greater risk of an adverse health event because the potential complications of the

procedure, the risks of which increase with the amount of time the device has been implanted, include "cardiac or vascular avulsion, or tearing (requiring thoracotomy, pericardiocentesis, chest tube, or surgical repair), pulmonary embolism, stroke, and pacing system related infection of a previously non-infected site."

37.     Notwithstanding the same, **PLUNKITT** has made a practice of performing lead extractions on the overwhelming number of patients where **SCHULTZ** worked alongside him regardless of whether there was an infection or not. In fact, most patients had no infection and there was absolutely no medical need to perform the lead extractions – they were actually contra-indicated.

38.     **SCHULTZ** observed a great many patients' cardiac tissue ripped out of their pericardium in large chunks. For the patients identified in the paragraph below, the lead was pulled so hard by **PLUNKITT** that the spring uncoiled from within the lead - this means the lead was anchored into the patients' heart tissue and was pulled with a great deal of force. Knowing the impropriety of his actions, **PLUNKITT** would quickly remove the heart tissue from coil before **SCHULTZ** was able to capture a photograph of the patients' cardiac tissue having been ripped from the patients' beating heart. So concerned was **PLUNKITT** with potential patient complications and a patient bleeding out, he ordered a "stat type & screen," which is a blood test if the physician believes a patient needs emergent blood. In short, **PLUNKITT** knew of the gross risk to patient safety and decided to check the patients' blood type and crossmatch it with packs of blood the Defendants (and PRMC) had in stock in the blood bank.

39.     Examples of those patients upon whom **PLUNKITT** performed unnecessary and dangerous lead extractions are hereby attached as Exhibits 1-5, which include the following patients' initials and dates the lead extraction was performed:

- Patient RB (performed 12/12/16)(Ex. 1);

- Patient CL (performed 3/6/17)(Ex. 2);

- Patient IG (performed 3/21/17)(Ex. 3);

- Patient TP (performed 3/27/17)(Ex. 4);

- Patient DO (performed 3/27/17)(Ex. 5);

40.   In all of those cases, the lead extractions were contra-indicated and medically unnecessary because **SCHULTZ** saw firsthand that there was no infection or other adverse symptom being caused by the implanted leads, and there was nothing documented by **PLUNKITT** in the patient charts to the contrary. But as described below, **PLUNKITT** billed and received Government monies for them nevertheless.

41.   **PLUNKITT**'s practices are revenue producing as he can receive large reimbursements from Medicare. But a former cardiology reviewer of complaints filed with the Medical Board of California (who enjoyed a more than 30-year career as a cardiologist in California and Hawaii and has testified as an expert in prior cardiology cases) and a current cardiologist in the State of Florida both agree with Dr. Feinberg's assessment and have both opined that the practices of **PLUNKITT** described above are grossly unsafe, are a stark departure from the requisite standard of care and, if proven true, would represent an unnecessary procedure that should not have been billed for. Moreover, both opine that any cardiologist would be aware that such practices are completely unnecessary and that submitting bills to Government Programs for the same would be fraudulent and that representing them as necessary would fraudulently induce the Government to pay **PLUNKITT** and **NHRS**.

42.   The Medicare reimbursement where **PLUNKITT** performs a lead extraction at PRMC is for an admitted patient is approximately $1,400.00 but where it is performed as an

outpatient procedure, which most of **PLUNKITT**'s lead extractions are, the reimbursement rate is approximately $2,500.00 to the facility and $600-$900 for **PLUNKITT**'s services.

43.    By contract, the reimbursement for simply and safely cap and replace lead is approximately $90.00 for **PLUNKITT**'s services.

44.    **SCHULTZ** has observed **PLUNKITT**'s practice for years and filed a complaint with the director of the PRMC catheterization lab.

45.    **SCHULTZ** estimates that **PLUNKITT** performs approximately 260 unnecessary lead extractions per year.

46.    While **SCHULTZ** is not an employee of the Defendants, she was the nurse assigned to **PLUNKITT**'s cases and as such, she had access to each patients' medical records and **NHRS**' billing form (attached as Exhibit 6) for **PLUNKITT**'s patients that **SCHULTZ** assisted him with. In that capacity, **SCHULTZ** observed that **PLUNKITT** himself completed the **NHRS** billing form and that he personally added CPT Codes 33244, 33234 and/or 33235 for the above-identified unnecessary lead removals and hundreds more – each form contained the patients' name on a sticker that was placed at the top. This form is used by **NHRS** strictly for billing purposes. **SCHULTZ** observed that this **NHRS** form (that **PLUNKITT** completed and personally selected the CPT codes on) was then given to **NHRS**' biller, who would often pick them up at PRMC and who **SCHULTZ** overheard was instructed to bill those CPT codes, which included the above-identified unnecessary lead removals and hundreds more. This was confirmed during **SCHULTZ**'s investigation, which included confirmation of the same from former **NHRS** staff with direct knowledge of **PLUNKITT**'s billing – it was also **NHRS**' set policy that its biller was to bill precisely the CPT codes that **PLUNKITT** personally added on the **NHRS** billing form, which billing occurred in the days that followed the procedures. **SCHULTZ** also observed that

11

these unnecessary lead extractions were included in the PRMC procedure notes, which means that they were automatically billed for by **NHRS**, which certified the medical necessity of such procedures (including the above-identified unnecessary lead removals and hundreds more). **SCHULTZ**'s investigation also revealed that the Defendants indeed received reimbursement for those claims made to the Government. In sum, **PLUNKITT** did in fact bill CPT Code 33244, 33234 or 33235 for above-identified lead removals – which were unnecessary – on those patients identified above (and on many others) and did receive reimbursement for such false claims.

47.     Upon information and belief, during at least the past 6 years, the Defendants have submitted hundreds (if not thousands) of claims to Medicare and Medicaid for unnecessary lead extractions using CPT Code 33244, 33234 or 33235.

48.     Medicare and Medicaid regulations do not allow reimbursement to providers where the lead extractions were not medically necessary and yet **PLUNKITT**'s submission of such claims to Medicare and Medicaid was knowingly fraudulent because he knew such procedures were medically unnecessary but he nevertheless caused them to be billed and then received payment for the same from the Government.

49.     The Defendants submitted false claims to Medicare and Medicaid by representing that the lead extractions were medically necessary when they were not. The Defendants then collected reimbursement on these claims to Medicare and Medicaid for the medically unnecessary lead extractions.

50.     Despite knowing that the lead extractions were unnecessary, the Defendants' have knowingly retained Medicare and Medicaid reimbursement monies that were fraudulently obtained.

51.     Despite knowledge of the falsity of their claims to Medicare and Medicaid for unnecessary lead extractions, the Defendants have refused to disgorge their ill begotten gains.

52.     Thus, the Defendants have caused thousands of false claims to be submitted to Medicare and Medicaid as they knowingly submitted claims to Medicare and Medicaid for the performance of medically unnecessary, and dangerous, lead extractions.

**B.      Defendants' Submission of Claims to the Program for the Unnecessary and Dangerous Implantation of Defibrillators and Unnecessary Pacemakers.**

53.     From the commencement of Relator Schultz's employment with PRMC, she gained knowledge of and witnessed the Defendants' submission of false claims to Medicare and Medicaid for the unnecessary and dangerous implantation of defibrillators and pacemakers performed by **PLUNKITT** for pecuniary gain and not medical necessity whatsoever.

54.     The vast majority of patients at PRMC that are treated by **PLUNKITT** are Medicare recipients.

55.     Pacemakers and implantable cardioverter-defibrillators (ICDs) deliver energy to the heart through thin, flexible wires called leads.

56.     **PLUNKITT** has made a practice of implanting defibrillators and pacemakers without receiving patient consent and without performing the study necessary to substantiate medical necessity. **PLUNKITT** also does not obtain patient consent to perform lead extractions.

57.     **SCHULTZ** has observed that **PLUNKITT** frequently begins to implant a defibrillator and *then* performs his own study in an attempt to justify the implantation of the defibrillator after the fact and justify the billing for the same.

58.     **PLUNKITT** implants defibrillators and pacemakers in patients that are not going to clinically benefit from these extra leads in order to receive a dual chamber pacemaker at a higher cost instead of a single chamber pacemaker.

13

59.    **SCHULTZ** has heard that **PLUNKITT** is under investigation by Naples Community Hospital (NCH) for similar practices, and has implanted a cardiac pacemaker on a clinically brain-dead NCH patient.

60.    **PLUNKITT** has also unnecessarily implanted biventricular intracardiac cardioverter defibrillators (BiVICD) on patients that do not meet Medicare requirements for implementation (Ejection Fraction less than 30%, sustained ventricular fibrillation/tachycardia, etc.) or who have provided documentation to support the implantation after the completion of the procedure. This has been witnessed by Victoria Cassisi, administrative assistant for the PRMC Catheterization Lab. Ms. Louise Smith, catheterization lab clinical coordinator, also witnessed this.

61.    Examples of **PLUNKITT**'s practice in this regard are hereby attached as Exhibit 7.

62.    This device is approximately $30,000.00 and procedure is well over $100,000.00. **PLUNKITT**'s practices are revenue producing as he can receive large reimbursements from Medicare.

63.    **SCHULTZ** has observed **PLUNKITT**'s practice for years.

64.    Upon information and belief, during at least the past 6 years, the Defendants have submitted thousands of claims to Medicare and Medicaid for unnecessary lead extractions.

65.    Medicare and Medicaid regulations do not allow reimbursement to providers where the implantations were not medically necessary.

66.    The Defendants submitted false claims to Medicare and Medicaid by representing that the implantations were medically necessary when they were not. The Defendants then

collected reimbursement on thousands of claims to Medicare and Medicaid for the medically unnecessary implantations.

67.     Despite knowing that the implantations were unnecessary, the Defendants' have knowingly retained Medicare and Medicaid reimbursement monies that were fraudulently obtained.

68.     Despite knowledge of the falsity of their claims to Medicare and Medicaid for unnecessary implantations, the Defendants have refused to disgorge their ill begotten gains.

69.     Thus, the Defendants have caused thousands of false claims to be submitted to Medicare and Medicaid as they knowingly submitted claims to Medicare and Medicaid for the performance of medically unnecessary, and dangerous, implantations.

## COUNT I- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(A)**

70.     Relator incorporates by reference the allegations paragraphs 1-69 as if fully set forth in this Count.

71.     From at least 2014 to present, the Defendants violated the FCA, 31 U.S.C. §3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

72.     The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the medical necessity of lead extractions, and (b) the claims contained false and fraudulent information regarding the medical necessity of implanting defibrillators and

pacemakers. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

73.     The monies the Defendants obtained through its false or fraudulent submissions to the Program were provided in whole or in part by the United States.

74.     The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

75.     The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

76.     The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

77.     By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1)      Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

2)      A civil penalty of not less than $5,500.00 and not more than $11,000.00

for each false claim which the Defendants caused to be submitted to the

United States;

3)      Prejudgment Interest;

4)      All costs incurred in bringing this action.

To the Relator:

1)  The maximum amount allowed pursuant to §3730(d) of the FCA and/or any

other applicable provision of law;

2)  Reimbursement for reasonable expenses which Relator incurred in connection

with this action;

3)  An award of reasonable attorney's fees and costs, and;

4)  Such further relief as this Court deems equitable and just.

## COUNT II- DAMAGES & PENALTIES UNDER THE FCA

**(Defendants' Violation of 31 U.S.C. §3729(a)(1), as amended, 31 U.S.C. §3729(a)(1)(B)**

78.     Relator incorporate by reference the allegations paragraphs 1-69 as if fully set forth

in this Count.

79.     From at least 2014 to present, the Defendants violated the FCA, 31 U.S.C.

§3729(a)(1), and as amended, by knowingly, in reckless disregard or deliberate ignorance of the

truth or falsity of the information it conveyed, presented or caused to be presented false or

fraudulent claims for payment or approval to the United States.

80.     The claims were fraudulent because the Defendants made requests or demands for

payment from the Program where: (a) the claims contained false and fraudulent information

regarding the medical necessity of lead extractions, and (b) the claims contained false and

fraudulent information regarding the medical necessity of implanting defibrillators and pacemakers. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

81.    The monies the Defendants obtained through its false or fraudulent submissions to the Program were provided in whole or in part by the United States.

82.    The United States and Florida were unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

83.    The United States and Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

84.    The Defendants' compliance with the Program, Medicare and state regulations was material to the United States' and Florida's decision to disburse funds to the Defendants.

85.    By reason of the Defendants' wrongful conduct, the United States has suffered and continues to suffer substantial damages.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1)  Three times the amount of actual damages which the United States has sustained as a result of the Defendants' conduct;

18

2) A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the United States;

3) Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relator:

1) The maximum amount allowed pursuant to §3730(d) of the FCA and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

## COUNT III- DEFENDANT'S VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

86.     Relator incorporates by reference the allegations in paragraphs 1-69 as if fully set forth in this paragraph.

87.     This is a *qui tam* action brought by the Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §68.081 *et seq*.

88.     Fla. Stat. §68.082(2) provides liability for any person who:

(a)     Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

89.     From at least 2014 to present, the Defendants violated the Florida FCA (FFCA) Fla. Stat. §68.082(2) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be presented false or fraudulent claims for payment or approval to the State of Florida.

90.     From at least 2014 to present, the Defendants violated the FFCA, Fla. Stat. §68.082(2)(b) by knowingly, in reckless disregard or deliberate ignorance of the truth or falsity of the information they conveyed, presented or caused to be made or used a false record or statement material to a false or fraudulent claim paid or approved by an agency.

91.     The claims were fraudulent because the Defendants made requests or demands for payment from the Program where: (a) the claims contained false and fraudulent information regarding the medical necessity of lead extractions, and (b) the claims contained false and fraudulent information regarding the medical necessity of implanting defibrillators and pacemakers. All of these were fraudulent attestations by the Defendants in order to receive Program monies.

92.     The monies the Defendants obtained through their false or fraudulent submissions to the Program were provided in whole or in part by the State of Florida.

93.     The State of Florida was unaware of the falsity of the claims and/or statements which the Defendants submitted and/or caused to be submitted to the United States and in reliance on the accuracy thereof, paid the Defendants for reimbursement that otherwise would not have been paid and/or were ineligible for payment.

94.     The State of Florida, being unaware of the falsity of the claims and/or statements caused to be made by the Defendants and in reliance on the accuracy thereof, paid and continues

to pay the Defendants for Program monies that would otherwise not have been paid and/or were ineligible for payment.

95.     Compliance with applicable Medicare, Medicaid and the various other federal and states laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida by the Defendants. Compliance with applicable Florida statutes/regulations was also an express condition of payment of claims submitted to the State of Florida.

96.     Had the State of Florida known that the false representations were made by the Defendants, it would not have paid the claims.

97.     As a result of the Defendants' violations of Fla. Stat. §68.082(2), the State of Florida has been damaged.

98.     Relator has direct and independent knowledge of the allegations of this Complaint and has brought this action pursuant to Fla. Stat. §68.083(2) on behalf of themselves and the State of Florida.

WHEREFORE, the Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the United States:

1)  Three times the amount of actual damages which the State of Florida has sustained as a result of the Defendants' conduct;

2)  A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false claim which the Defendants caused to be submitted to the State of Florida;

3)  Prejudgment Interest;

4) All costs incurred in bringing this action.

To the Relator:

1) The maximum amount allowed pursuant to Fla. Stat. §68.085 and/or any other applicable provision of law;

2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

3) An award of reasonable attorney's fees and costs, and;

4) Such further relief as this Court deems equitable and just.

Respectfully submitted,

Dated: July 3, 2019                    **/s/ Benjamin H. Yormak**
                                       Benjamin H. Yormak
                                       Florida Bar Number 71272
                                       Trial Counsel for Relator
                                       YORMAK EMPLOYMENT & DISABILITY LAW
                                       9990 Coconut Road
                                       Bonita Springs, Florida 34135
                                       Telephone: (239) 985-9691
                                       Fax: (239) 288-2534
                                       Email: byormak@yormaklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

*/s/ Benjamin H. Yormak*
Benjamin H. Yormak